IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **RITA PATEL,** on behalf of herself and all other similarly situated employees, known and unknown, | Civil Action |
| Plaintiff, | |
| v. | |
| **OM GAYATRI, INC.,** an Illinois corporation, **SHREE KALI, INC.,** an Illinois corporation, **ASHWIN PATEL,** individually, **SUNNY PATEL,** individually, **KARTHIK PATEL,** and **ASHOK PANDYA,** individually, | No. |
| Defendants. | JURY DEMAND |

## COMPLAINT

By and through her attorneys of record and on behalf of herself and all other similarly situated employees, known and unknown, the plaintiff, RITA PATEL (the "Plaintiff"), complains of the defendants, OM GAYATRI, INC., an Illinois corporation, SHREE KALI, INC., an Illinois corporation, ASHWIN PATEL, individually, SUNNY PATEL, individually, KARTHIK PATEL, and ASHOK PANDYA, individually (collectively the "Defendants"). Pleading hypothetically and in the alternative, the Plaintiff alleges as follows:

## I.  INTRODUCTION

1. This action arises under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, as a result of the Defendants' failure to pay the Plaintiff and other similarly situated employees of the Defendants (the "Collective Class") time and one-half compensation for certain overtime (in excess of 40 in any given week) hours they worked. In Count I, the Plaintiff brings a claim pursuant to Section 216(b) of the FLSA.

2.      In Count II, the Plaintiff brings a supplemental claim under the Illinois Minimum Wage Law ("IMWL"), 829 ILCS 105/1 *et seq*.; Count II generally tracks Count I, but is brought pursuant to the Illinois law rather than federal law.

3.      In Count III, the Plaintiff brings a supplemental claim under the Illinois Wage Payment and Collection Act, 829 ILCS 115/1 *et seq*. alleging that, among other things, in addition to their failure to pay the Plaintiff overtime compensation for certain hours, the Defendants simply shorted the Plaintiff's pay altogether in most weeks.

II.     **THE PARTIES**

4.      The Plaintiff is an individual who is domiciled in Illinois and resides within the Northern District of Illinois.

5.      The following defendants are individuals who, upon information and belief, are domiciled in Illinois and reside within the Northern District of Illinois: a) ASWIN PATEL; b) SUNNY PATEL; c) KARTHIK PATEL; and d) ASHOK PANDYA.

6.      The defendant, OM GAYTRI, INC.  is an Illinois corporation whose: a) registered office is located at or near 2672 N. River Road, Schiller Park IL 60171; and b) principal place of business is located at or near 2672 N. River Road, Schiller Park IL 60171.

7.      The defendant, SHREE KALI, INC. is an Illinois corporation whose: a) registered office is located at or near 2672 N. River Road, Schiller Park IL 60171; and b) principal place of business is located at or near 2672 N. River Road, Schiller Park IL 60171

III.     <u>JURISDICTION AND VENUE</u>

8.      Federal question jurisdiction is conferred on this Court by Section 16(b) of the FLSA and 28 U.S.C. §1331.

9.      Venue is proper as the acts or omissions that gave rise to the claims alleged herein occurred within this judicial district.

10.     Further, venue is proper pursuant to 28 U.S.C. § 1391, because OM GAYATRI, INC. and SHREE KALI, INC. have their principal places of business, at or near 2672 N. River Road, Schiller Park IL 60171.

IV.     <u>COLLECTIVE ACTION UNDER THE FLSA</u>

11.     The Plaintiff brings this case as a Collective action under the FLSA on behalf of herself and the Collective Class, and in accord with Section 16(b) of the FLSA, the Plaintiff has given written consent to bring such an action (attached as **Exhibit A**).

V.      <u>GENERAL ALLEGATIONS</u>

12.     OM GAYATRI, INC. and SHREE KALI, INC. are all constituent parts of an integrated business; and, upon information and belief, the individual defendants are family members (*i.e.* siblings, parents, (adult) children, aunts, uncles and/or cousins).

13.     At all times relevant to this action, the Defendants have been engaged in the business of owning and operating Dunkin Donuts franchises engaged in the business of selling coffee, pastries and other concessions to the general public in the Northern District of Illinois (the "Coffee Business").

14.     At all times relevant to this action, the Coffee Business owned and operated a Dunkin Donuts franchise at or near 2672 N. River Road, Schiller Park IL 60171, at which the Plaintiff worked.

3

15.     At all times relevant to this action the Coffee Business owned and operated a Dunkin Donuts franchise at or near 1004 W. Irving Park Road, Bensenville, IL 60106, at which the Plaintiff also worked.

16.     Upon information and belief, at all times relevant to this action, the Coffee Business owned and operated, and continues to own and operate, in excess of 25 other Dunkin Donuts franchises engaged in the business of selling coffee, pastries and other concessions to the general public in the Northern District of Illinois.[1]

17.     At all times relevant to this action, the Defendants employed a business model wherein the individual defendants operate the Coffee Business centrally, managing the books, accounts payable, accounts receivable, payroll, human resources, financing, procurement and relations centrally from a single location or from several, integrated locations.

18.     At all times relevant to this action, the Defendants structured their Coffee Business such that, in most cases, they created a separate company to be the face of each retail store that they operate.  Each of these separate companies performed/performs related activities for a common business purpose, more specifically, the sale of coffee, pastries and other concessions to the general public.

---

[1] The Plaintiff was present at the 2672 N. River Road Dunkin Donuts on numerous occasions when the individual defendants held business meetings there and overheard them discuss the operation of their other Dunkin Donuts stores.  In particular, the Plaintiff overheard the individual defendants discuss assigning employees from one location to cover shifts at other location/s just as they did with the Plaintiff (see below).

19.     At all times relevant to this action, the various arms of the Coffee Business were managed centrally by the individual defendants, whether or not these various arms were tied to allegedly separate corporations or limited liability companies.

20.     At all times relevant to this action, the following business entities were part of the Defendants' Coffee Business: a) OM GAYATRI, INC.; b) SHREE KALI, INC.; and c) upon information and belief, numerous, additional business entities whose official, corporate names are currently unknown to the Plaintiff.

21.     At all times relevant to this action, the business entities identified in the preceding paragraph (the "Corporate Entities") have been dominated by the individual defendants, ASHWIN PATEL, SUNNY PATEL, KARTHIK PATEL, and ASHOK PANDYA (the "Common Control Group").

22.     The Common Control Group operated the Corporate Entities as if they were a single company that they controlled completely, moving money, goods, resources and employees between and among the various Corporate Entities at their pleasure.

23.     The Corporate Entities are vertically integrated – for example, the Common Control Group procured marketing services, supplies and resources in bulk, and allocated them among the various retail stores they controlled.

24.     Similarly, the Common Control Group procured the services of vendors on a company-wide basis, allocating them among the various retail stores they controlled.

25.     Upon information and belief, at all times relevant to this action, the respective control groups (or de facto control groups) of the Corporate Entities have consisted of substantially the same, if not an identical, group of individuals from the Common Control Group.

5

26.     Upon information and belief, at all times relevant to this action, the respective administrative staffs of all or most the Corporate Entities have consisted of substantially the same, if not an identical, group of individuals.

27.     Upon information and belief, at all times relevant to this action, the records of all or most of the Corporate Entities have generally been kept in the same, central location or integrated locations.

28.     Upon information and belief, at all times relevant to this action, the Common Control Group has used the same computer, server or computer network, to keep the books and records of all or most of the Corporate Entities.

29.     Upon information and belief, at all times relevant to this action, the respective sets of data, which constitute the books of all or most of the Corporate Entities, have resided on the same computer, server or computer network.

30.     Upon information and belief, at all times relevant to this action, the same individual, or group of individuals, has/have performed the routine, day-to-day bookkeeping and payroll functions of all or most of the Corporate Entities.

31.     The Common Control Group's Coffee Business had gross receipts in excess of $500,000.00 in: a) 2014; b) 2015; c) 2016; d) 2017; and e) 2018.

32.     OM GAYATRI, INC. had gross receipts in excess of $500,000.00 in: a) 2014; b) 2015; c) 2016; d) 2017; and e) 2018.

33.     SHREEE KALI, INC. had gross receipts in excess of $500,000.00 in: a) 2014; b) 2015; c) 2016; d) 2017; and e) 2018.

34. At all times relevant to this action, the Common Control Group's Coffee Business employed a structure in which one or two business entities formed the nucleus of a group interrelated and integrated companies.

35. Upon information and belief, at all times relevant to this action, one or both of the following Corporate Entities were the nucleus of the Coffee Business, and are the vehicle/s by which the Common Control Group supplied business infrastructure services to the other Corporate Entities: a) OM GAYATRI, INC.; and/or b) SHREE KALI, INC.

36. Upon information and belief, at all times relevant to this action, the telephone, internet, and information technology services used by all or most of the Corporate Entities were procured or paid for by one or both of the following Corporate Entities: a) OM GAYATRI, INC.; and/or b) SHREE KALI, INC.

37. Upon information and belief, the computer software and hardware used to process all or most of the Corporate Entities' payroll and tax records was procured or paid for by one or both of the following Corporate Entities: a) OM GAYATRI, INC.; and/or b) SHREE KALI, INC.

38. Upon information and belief, at various times relevant to this action, personnel whose wages were paid with checks drawn on accounts held by only one of the Corporate Entities, acted in the interests of the Coffee Business as a whole – for example, personnel who were paid with checks drawn on OM GAYATRI, INC.'s accounts processed payroll and tax documents for SHREE KALI, INC. and/or vice versa.

39. At all times relevant to this action, all members of the Common Control Group had the power to: a) direct the Plaintiff's work and that of the Collective Class members; b) set the Plaintiff's work schedules and those of the Collective Class members; c) access and

review the Plaintiff's work time and payroll records and those of the Collective Class; d) control the Coffee Business's human resources and payroll functions relative to the Plaintiff and the Collective Class members; and e) hire and fire the Plaintiff and the Collective Class members.

40. At all times relevant to this action, on a day-to-day basis ASHWIN PATEL: a) directed the Plaintiff's work and that of the Collective Class members; b) set the Plaintiff's work schedules and those of the Collective Class members; c) maintained the Plaintiff's work time and payroll records and those of the Collective Class members; and d) had direct control over the Defendants' human resources and payroll functions relative to the Plaintiff and the Collective Class member.

41. On or about December 23, 2017, the Common Control Group, or one of its members, fired the Plaintiff.

42. At all times relevant to this action, the Coffee Business operated, controlled and/or constituted an "enterprise" within the meaning of Section 3(r) of the FLSA.

43. At all times relevant to this action, each of the following Corporate Entities operated, controlled and/or constituted an "enterprise" within the meaning of Section 3(r) of the FLSA: a) OM GAYATRI, INC.; and/or b) SHREE KALI, INC.

44. During the course of her employment by the Defendants, the Plaintiff received payroll checks issued by both OM GAYATRI, INC., and SHREE KALI, INC.

45. The Plaintiff was employed by one or more of the Defendants[2] as a retail service clerk, from 2003 until December 23, 2017, when she was fired.

---

[2] "Plaintiffs plausibly contend that they are unable at this time to specifically identify their employer(s) given the number of individuals and entities involved in the project and the fact that they did not receive pay stubs or other

46. During the course of their employment by the Defendants, the Plaintiff and the Collective Class members operated cash registers, prepared food and beverages for customers, cleaned the retail stores, emptied garbage bins and performed other duties incumbent upon the operation of retail food service establishments.

47. During the course of their employment by the Defendants, the Plaintiff and the Collective Class members routinely caused information to be transmitted across state lines in that they processed electronic card payments from the Defendants' customers.

48. At all times relevant to this action, the Defendants, and each of them, were the Plaintiff's "employer" within the meaning of Section 3(a) and (d) of the FLSA in that the Defendants acted directly or indirectly in the interest of the "employer" in relation to the employee plaintiffs represented herein, and are therefore jointly and severally liable for the unpaid wages and other relief sought herein.

49. At all times relevant to this action, the Defendants, and each of them, were the Plaintiff's "employer" within the meaning of Section 3(c) of the IMWL in that the Defendants acted directly or indirectly in the interest of the "employer" in relation to the employee plaintiffs represented herein, and are therefore jointly and severally liable for the unpaid wages and other relief sought herein.

50. At all times relevant to this action, the Plaintiff was an "employee" of the Defendants within the meaning of Section 3(e)(1) of the FLSA.

---

documentation in connection with their employment." *Sanchez v. Haltz Const. Inc.*, 2012 U.S. Dist. LEXIS 537, 2-3. Here, among other things, the Plaintiff received checks from both OM GAYATRI, INC. and SHREE KALI, INC. while working for the Coffee Business, even though her work was supervised and managed by the same group of individuals.

51.    At all times relevant to this action, the members of the Collective Class were/are "employees" of the Defendants within the meaning of Section 3(e)(1) of the FLSA.

52.    At all times relevant to this action, the Plaintiff was an "employee" of the Defendants within the meaning of Section 3(d) of the IMWL.

53.    During the course of their employment by the Defendants, the Plaintiff and the Collective Class members handled/handle goods that moved in interstate commerce including but not limited to coffee, dairy products, bleach, other cleaning products and plastic garbage bags.

54.    During the course of their employment by the Defendants, the Plaintiff and the Collective Class were/are not exempt from the maximum hour (overtime) provisions of the FLSA and/or the IMWL.

**The Defendants' Scheme to Avoid Paying Proper Overtime Compensation**

55.    During the course of her employment by the Defendants, the Defendants allowed and required the Plaintiff to work *extremely* long hours – usually in excess of 18 hours per day, 6 days per week – such that the Defendants' employment practices seem more like an exposé of Third World servitude than a chronicle that unfolded in the United States in the twenty-first century.

56.    The Defendants went to great lengths to hide their improper payroll practices and, as a result, the Defendants' records falsely show that the Plaintiff worked far fewer hours each day than she actually did.

57.    The Defendants' records grossly underreport the number of hours that the Plaintiff actually worked because, among other reasons:

a. The Defendants allowed the Plaintiff to begin working each day before they allowed her to clock in – she usually began working at least 4 hours before she was allowed to clock in; and

b. The Defendants routinely required the Plaintiff to work additional hours at their Dunkin Donuts franchise in Bensenville after she had finished working at the Defendants' Dunkin Donuts franchise in Schiller Park and, when they did so, the Defendants would typically clock the Plaintiff out of their time keeping system at seemingly random times, which bore no relationship to the times at which the Plaintiff actually finished work.[3]

58.    Oddly, the Plaintiff's pay stubs often did not match the Defendants' time records: the Plaintiffs' pay stubs would often indicate she was paid for fewer hours than were listed for her in the Defendants' time records – leaving a paper trail that appears to show, on its face, that the Defendants shorted the Plaintiff's pay.

59.    However, the discrepancy between the Plaintiff's pay and the Defendants' time records was simply part of the Defendants' highly sophisticated scheme to hide their improper payroll practices.

60.    The discrepancy between the Plaintiff's pay and the Defendants' time records appears to show the Defendants shorted the Plaintiff for far fewer hours than she was

---

[3] For example, at least several days each week, the Defendants would tell the Plaintiff to leave their Schiller Park store and to go work at their Bensenville store.  They would tell the Plaintiff not to clock out because, they claimed, they would clock her out when she finished working at their Bensonville store (or otherwise cause their records to reflect the times at which she finished working at their Bensonville store).  In reality however, the Defendants typically caused their records to falsely reflect that the Plaintiff had clocked out many hours before she actually finished working each day.

actually shorted (*e.g.* about 5 hours short per week instead of about 50 or more hours short per week).

61.    Upon information and belief (based upon comments the individual defendants made to the Plaintiff when she would complain about her pay among other things), the Defendants purposely created a set of false time records that show relatively minor discrepancies in order to insulate themselves from liability for quite significant discrepancies.

62.    In other words, in the event an employee ever filed an action such as the captioned case, the Defendants could point to the falsified records and claim that any liability were de minimis (or, if not diminimis, far, far less than the reality) in hopes of discrediting the claim that s/he were shorted a much greater amount of pay.

63.    Occasionally, as all employees do, the Plaintiff would take days off and would arrive late or leave early but, for the most part, she kept a regular schedule.

64.    Typically, the Defendants allowed the Plaintiff to begin work at 6:00 a.m. each day; she normally began working at the Defendants' Schiller Park franchise.

65.    As indicated above however, even though the Defendants allowed the Plaintiff to begin working at 6:00 a.m. each day, they did not allow her to clock in until about 10:00 a.m.

66.    Typically, the Defendants allowed the Plaintiff to work each day at their Schiller Park franchise until anywhere between 7:00 p.m. and 10:30 p.m.; the Defendants would then send the Plaintiff to continue working at their Bensenville franchise until about 1:00 a.m.

67. The Defendants often directed the Plaintiff to bring certain supplies (*e.g.* coffee, sugar, bagels) with her from their Schiller Park franchise to their Bensenville franchise, in order to keep their Bensenville franchise stocked; and the Plaintiff would often do so.

68. The Defendants often directed the Plaintiff to bring cash with her from their Schiller Park franchise to their Bensenville franchise, in order to ensure that there was enough cash in the register at their Bensenville franchise to make change for customers; and the Plaintiff would often do so.

69. As indicated above, the Defendants would clock the Plaintiff out (or otherwise amend their time records after the fact) and, as a result, even though the Plaintiff actually routinely worked until 1:00 a.m., the Defendants' time records falsely indicate that the Plaintiff stopped working and clocked out at various, seemingly random, times each day.

70. Typically, the Defendants allowed and required the Plaintiff to work 6 days per week during the course of her employment.

71. Sometimes, the Defendants even allowed and required the Plaintiff to work 7 days per week.

72. Accordingly, during the course of her employment, the Plaintiff worked an average of about 108 hours per week for the Defendants with occasional fluctuations.

73. The Plaintiff normally worked through her lunch breaks and ate while working.

74. As result of the Defendants' improper practices described above, the Defendants' time records grossly underreport the number of hours the Plaintiff actually

worked: the Defendants' time records falsely indicate that she worked an average of about 50 hours per week – less than *half* of what she actually worked.

75.     The Defendants purported to pay the Plaintiff by the hour at the rate (for the last several years of her employment) of $10.00 per hour and purported to pay the Plaintiff at the rate of $15.00 per hour overtime hours; certain pay stubs the Defendants issued to the Plaintiff appear to indicate as much.

76.     In reality however, because of the fact that the Defendants' time records so grossly underreport the number of hours the Plaintiff actually worked, the Plaintiff's de facto hourly rate often fell below the federal and Illinois minimum rates – even in weeks in which the Plaintiff's (falsified) pay stubs appear to show she was paid overtime for some hours at the rate of $15.00 per hour.

77.     The Defendants failed to display a poster, or any other literature, that would have apprised the Plaintiff of her rights under the FLSA, the IMWL and the IWPCA and, as a result, applicable statutes of limitation were tolled under the doctrine announced in *Bonham v. Dresser Industries, Inc.*, 569 F.2d 187 (3d Cir. 1978) (see also *Chavez v. Don Stoltzner Mason Contr., Inc.*, 2010 U.S. Dist. LEXIS 33289 (Aspen, J.), *Cisneros v. Jinny Beauty Supply Co., Inc.*, 2004 U.S. Dist. LEXIS 2094 (Grady, J.) and *Cortez v. Medina's Landscaping*, 2002 U.S. Dist. LEXIS 18831 (Gottschall, J.).

78.     The Defendants used the methods described above as part of their scheme to avoid paying the Plaintiff and other employees overtime compensation at the rates required by law.

79.     The Defendants used/use the same unlawful payroll practices relative to the Collective Class members as they did with the Plaintiff.

80. Upon information and belief, the Defendants continue the practice of failing to pay overtime premiums to the Collective Class members through the present day.

## COUNT I
### (Violation of the FLSA)

81. The Plaintiff re-alleges the foregoing paragraphs.

82. Among other ways, the Defendants violated the FLSA by:

    a. failing to pay the Plaintiff at a rate not less than one and one-half times her regular hourly rate for the overtime hours (in excess of 40 in any given week) she worked;

    b. failing to pay the Plaintiff at a rate not less than the applicable, federal minimum wage rate for certain hours that she worked;

    c. failing to provide the Plaintiff with pay stubs that accurately listed the number of hours she worked each week;

    d. failing to accurately record the number of hours that the Plaintiff worked each week; and

    e. failing to hang and display a poster in a prominent location accessible to the Plaintiff, which poster would have informed the Plaintiff of her rights under the FLSA.

83. Among other ways, the Defendants also violated the FLSA by:

    a. failing to pay the Collective Class members at rates not less than one and one-half times their respective, regular, hourly rates for the overtime hours they worked;

    b. failing to pay the Collective Class members at rates not less than the applicable, federal minimum wage rate for certain hours that they worked;

    c. failing to provide the Collective Class members with pay stubs that accurately listed/list the number of hours they worked/work each week;

    d. failing to accurately record the number of hours that the Collective Class members worked/work each week; and

    e.   failing to hang and display a poster in a prominent location accessible to the Collective Class members, which poster would have informed the Collective Class members of their rights under the FLSA.

84.    The Defendants' violation of the FLSA was willful in that the Defendants were aware or should have been aware of their obligations under the FLSA, but nevertheless attempted to circumvent its provisions.

85.    The Defendants failed to take affirmative steps to ascertain their obligations under the FLSA.

86.    As a direct and proximate result of the Defendants' actions and omissions, the Plaintiff and the Collective Class members were damaged in that they sustained pecuniary loss including but not limited to unpaid overtime wages and unpaid minimum wages.

WHEREFORE the Plaintiff, on behalf of herself and the Collective Class, prays for judgment in her favor and against the Defendants, and each of them, and for the following relief:

A.   damages in an amount equal to the unpaid overtime compensation due and owing to the plaintiffs for each hour the plaintiffs worked in excess of 40 in any given week, but for which the Defendants failed to pay the plaintiffs at rates not less than one and one-half times their respective, regular, hourly rates (in no case less than one and one-half times the IMWL's mandatory minimum rate under the doctrine of estoppel);

B.   damages in an amount equal to the unpaid minimum wages due and owing to the plaintiffs for each hour the plaintiffs worked for which they were paid at a rate not less than the applicable, federal minimum wage rate;

C.   statutory liquidated damages as allowed by the FLSA;

D.   interest on all amounts awarded;

E.   attorneys' fees, together with costs of suit and collection; and

F.   such further relief as may be fair and just in the premises.

16

## COUNT II
### (Violation of the IMWL)

87.     The Plaintiff re-alleges the foregoing paragraphs.

88.     Any and all Collective Class members who join this action under the "opt-in" procedure set forth in 29 U.S.C. 216(b) will also affirmatively adopt the allegations in this Count II.

89.     Among other ways, the Defendants violated the IMWL by:

   a.   failing to pay the Plaintiff at a rate not less than one and one-half times her regular hourly rate for the overtime hours (in excess of 40 in any given week) she worked;

   b.   failing to pay the Plaintiff at a rate not less than the applicable, federal minimum wage rate for certain hours that she worked;

   c.   failing to provide the Plaintiff with pay stubs that accurately listed the number of hours she worked each week;

   d.   failing to accurately record the number of hours that the Plaintiff worked each week; and

   e.   failing to hang and display a poster in a prominent location accessible to the Plaintiff, which poster would have informed the Plaintiff of her rights under the IMWL.

90.     The Defendants were aware or should have been aware of their obligations under the IMWL, but nevertheless attempted to circumvent its provisions.

91.     The Defendants failed to take affirmative steps to ascertain their obligations under the IMWL.

92.     As a direct and proximate result of the Defendants' actions and omissions, the Plaintiff and the Collective Class members were damaged in that they sustained pecuniary loss including but not limited to unpaid overtime wages and unpaid minimum wages.

WHEREFORE the Plaintiff prays for judgment in her favor and against the Defendants, and each of them, and for the following relief:

A. damages in an amount equal to the unpaid overtime compensation due and owing to the Plaintiff for each hour the Plaintiff worked in excess of 40 in any given week, but for which the Defendants failed to pay the Plaintiff at a rate not less than one and one-half times his regular, hourly rate (in no case less than one and one-half times the IMWL's mandatory minimum rate);

B. damages in an amount equal to the unpaid minimum wages due and owing to the plaintiffs for each hour the plaintiffs worked for which they were paid at a rate not less than the applicable, federal minimum wage rate;

C. statutory punitive damages as allowed by the IMWL;

D. interest on all amounts awarded;

E. attorneys' fees, together with costs of suit and collection; and

F. such further relief as may be fair and just in the premises.

## COUNT III
### (Violation of the IWPCA)

93. The Plaintiff re-alleges the foregoing paragraphs.

94. Any and all Collective Class members who join this action under the "opt-in" procedure set forth in 29 U.S.C. 216(b) will also affirmatively adopt the allegations in this Count III.

95. The Defendants had agreed to pay the Plaintiff at the rate of $10.00 per hour, as is indicated on the pay stubs issued by the Defendant to the Plaintiff.

96. However, as indicated above, the Defendants shorted the Plaintiff's pay by many hours each week.

97. Among other ways, the Defendants violated the IWPCA by:

a. failing to pay the Plaintiff for every hour that she worked;

b.  failing to provide the Plaintiff with pay stubs that accurately listed the number of hours she worked each week;

c.  failing to accurately record the number of hours that the Plaintiff worked each week; and

d.  failing to hang and display a poster in a prominent location accessible to the Plaintiff, which poster would have informed the Plaintiff of her rights under the IWPCA.

98.    The Defendants were aware or should have been aware of their obligations under the IWPCA, but nevertheless attempted to circumvent its provisions.

99.    The Defendants failed to take affirmative steps to ascertain their obligations under the IWPCA.

100.    As a direct and proximate result of the Defendants' actions and omissions, the Plaintiff and the Collective Class members were damaged in that they sustained pecuniary loss including but not limited to unpaid regular wages (often referred to as "gap pay" – the gap between the statutory minimum and the required overtime premium).

WHEREFORE the Plaintiff prays for judgment in his favor and against the Defendants, and each of them, and for the following relief:

G.  damages in an amount equal to the unpaid regular wages due and owing to the Plaintiff for each hour the Plaintiff worked but for which the Defendants failed to compensate her (including but not limited to "gap-pay" and/or wages that the Defendants simply failed to pay altogether);

H.  statutory punitive damages as allowed by the IWPCA;

I.  interest on all amounts awarded;

J.  attorneys' fees, together with costs of suit and collection; and

K.  such further relief as may be fair and just in the premises.

## JURY DEMAND

The Plaintiff demands a trial by jury of all issues set forth herein that are capable of being tried by a jury.

Respectfully submitted,

/s/Paul Luka
One of the Plaintiff's Attorneys

Paul Luka
MENDOZA LAW, P.C.
120 S. State Street, Suite 400
Chicago, IL 60603
(312) 508-6010
paul@alexmendozalaw.com

# EXHIBIT
# A

## CONSENT TO BE A PARTY PLAINTIFF

The undersigned hereby authorizes and engages Mendoza Law, P.C. to pursue his/her claims for unpaid wages, and other relief, against Om Gayatri, Inc., Shree Kali, Inc., Ashwin Patel, Sunny Patel, Karthik Patel, Ashok Pandya, and any other person/s who may have employed him/her in conjunction with said person/s (collectively the "Employers"), and by the signature below the undersigned hereby consents to be a party plaintiff in a lawsuit brought against the Employers on behalf of him/herself and all other similarly situated employees, known and unknown, pursuant to 29 U.S.C. 216(b).

_____
Signature

_____
Print Name